IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION - COVINGTON

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>JOHN BRIAN MCLANE, JR., and )<br>PAUL ANTHONY NASH )<br>)<br>Defendants. )<br>)<br>_____ ) | Civil Action No. _____ |

## COMPLAINT

Plaintiff Securities and Exchange Commission alleges:

### I.   INTRODUCTION

1.   The Commission brings this action to enjoin Defendants John Brian McLane, Jr. ("McLane") and Paul Anthony Nash ("Nash") from violating the registration and antifraud provisions of the federal securities laws.  From no later than July 2017 through at least May 2018, Defendants operated an online pyramid and Ponzi scheme through Mindset 24 Global, LLC ("Mindset 24"), a multilevel marketing company ("MLM") that they owned and controlled. During that time period, Defendants raised over $1 million from hundreds of individuals in the United States and across the world through the unregistered offer and sale of securities in Mindset 24.  In addition, in connection with the offer and sale of those securities, Defendants engaged in a scheme to defraud investors and further engaged in practices that operated as a fraud or deceit upon those investors.

2. Mindset 24 purported to be a legitimate personal development company that offered different levels of online self-help instructional packages ("Series Packages") to the public through the company's website. Investors who purchased the Series Packages were enrolled in Mindset 24's compensation plan ("Compensation Plan"). Participants in the Compensation Plan ("Participants") were eligible to earn commissions from the recruitment of other investors and from "profit sharing pools" into which Defendants placed a percentage of the proceeds from all sales of the Series Packages company-wide.

3. Despite Defendants' promotion of Mindset 24 as a legitimate operation, there were no sales of Series Packages to bona fide retail customers; rather, all sales were to Participants, and thus all of Mindset 24's payouts to early Participants were made using funds received from later Participants. Accordingly, Defendants operated Mindset 24 as a textbook pyramid and Ponzi scheme.

4. Additionally, Defendants misappropriated approximately $51,000 of investor funds as revenue for Mindset 24, and Nash misallocated approximately $20,000 of investor funds to advantage a small minority of participants.

5. Defendants controlled all essential operations of Mindset 24, including creation of the Compensation Plan; development of the website; promotion of the enterprise; collection of investor funds and fees; establishment and maintenance of Participant accounts; and distribution of commissions and payments to Participants.

6. Participants' interests in the Compensation Plan were investment contracts constituting securities, the offer or sale of which was neither registered with the Commission, as required by the federal securities laws, nor exempt from registration.

7.      As a result of the conduct alleged in this Complaint, Defendants violated Sections 5 and 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77e and 77q(a); and Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5.  Unless restrained and enjoined, Defendants are reasonably likely to continue to violate the federal securities laws.

8.      The Commission therefore respectfully requests the Court enter: (i) permanent injunctions restraining and enjoining Defendants from violating the federal securities laws, and restraining and enjoining Defendants from engaging in certain further conduct; (ii) an order directing Defendants to pay disgorgement with prejudgment interest; and (iii) an order directing Defendants to pay civil money penalties.

## II.     DEFENDANTS

9.      McLane, age 51, is a resident of Hebron, Boone County, Kentucky.  He was the chief executive officer of Mindset 24 and co-founded the company along with Nash.  McLane was involved with several other short-lived and now-defunct MLMs that predate Mindset 24.

10.     Nash, age 63, is a resident of Davenport, Polk County, Florida.  He was the chief technical officer of Mindset 24 and co-founded the company along with McLane. Nash was involved with several other short-lived and now-defunct MLMs that predate Mindset 24.

## III.    RELATED ENTITY

11.     During the relevant time period, Mindset 24 was a Florida limited liability company with its principal place of business in Florence, Boone County, Kentucky. McLane and Nash equally controlled all essential operations of Mindset 24 and each owned 50% of the company through separate entities that they controlled. Mindset 24 is now inactive and was dissolved

administratively in September 2018. At no time did the company have a category of securities registered with the Commission.

## IV. JURISDICTION AND VENUE

12. The Court has subject matter jurisdiction over this action pursuant to Sections 20(b), 20(d) and 22(a) of the Securities Act, 15 U.S.C. §§ 77t(b), 77t(d) and 77v(a); and Sections 21(d) and 27(a) of the Exchange Act, 15 U.S.C. §§ 78u(d) and 78aa(a).

13. The Court has personal jurisdiction over Defendants and venue is proper in this District pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a), because, among other things, McLane resides in this District; Mindset 24 had its principal place of business in this District; and some or all of the acts and transactions in which Defendants engaged and that constitute violations of the federal securities laws occurred in this District.

14. In connection with the conduct alleged in this Complaint, Defendants, directly and indirectly, singly or in concert with others, have made use of the means or instrumentalities of interstate commerce, the means or instruments of transportation or communication in interstate commerce, the mails, and/or the facilities of a national securities exchange – namely, through Defendants' use of the Internet and email correspondence when conducting the acts and transactions described herein.

## V. FACTUAL BACKGROUND

### A. Formation of Mindset 24

15. McLane approached Nash in the spring of 2017 with the idea for Mindset 24, and in July 2017, they formed the company, each owning 50% through other separate entities that they wholly controlled.

16. Defendants structured Mindset 24 as a MLM operation – that is, an operation that relied on investors (who were Participants) to both sell the Series Packages, and at the same time, recruit other Participants to do the same. Both of the Defendants ran other MLM companies prior to Mindset 24, and thus both were aware of the MLM structure.

17. The product offered by Mindset 24 – the Series Packages – came at four separate levels of access to information and "mindset training" and at four price points: the Series 1 for $100, the Series 2 for $400, the Series 3 for $1,000, and the Series 4 for $2,000. The information and training in the packages consisted mainly of videos and workbooks from two marketing partners, one of whom was an entrepreneur and television personality who appeared in the television series "Shark Tank." The higher the level of the package, the more material a Participant had access to. And, as described below, a higher level entitled the Participant to a greater share in the Compensation Plan. Accordingly, Defendants routinely placed more emphasis on marketing the higher level packages to the public.

18. Defendants sold Series Packages to Participants in multiple U.S. states and internationally, with the majority of sales occurring in the United States. At no time, however, did Defendants require any Participants to be "accredited investors," as that term is defined in the federal securities laws.

      B.      **The Compensation Plan**

19. Like most MLM companies, Mindset 24 had a written Compensation Plan that described how Participants could qualify for commissions by buying or selling the Series Packages. Defendants devised the final version of the Compensation Plan in July 2017 and published it on Mindset 24's website, where it was made available to Participants.

20. Defendants' earlier draft of the Compensation Plan, however, contained a "retail bonus" and a "retail match." These were incentives that would have provided that Participants could earn commissions from sales of the Series Packages to bona fide retail customers – that is, customers who were ultimate end-users of the product and who did not participate in the Compensation Plan. Despite having these retail sales incentives in the draft, Defendants elected to exclude them from the final version of the Compensation Plan.

21. The Compensation Plan touted three ways that Participants could earn commissions from sales of Series Packages: (i) a "coded bonus," which paid 25% of a sale; (ii) a "coded match," which also paid 25% of a sale; and (iii) profit sharing pools into which Defendants placed 20% of the proceeds of all sales of Series Packages which then were split among participants in the pools at varying levels. In short, the Compensation Plan would pay a total of 70% of sales proceeds to Participants via this structure, while Defendants retained 30% for themselves as Mindset 24 revenue. Thus, Defendants and the Participants shared the profits from sales of the Series Packages.

22. As a prerequisite for receiving any of the three commission types, a Participant first had to buy or sell a given level of a Series Package and, in most instances, pay Mindset 24 a $50 annual fee and a $19.95 monthly fee. Defendants received these additional fees as part of their operation of Mindset 24.

23. The higher the level of Series Package that a Participant bought or sold, the higher the level of each commission the Participant was eligible to earn going forward, which incentivized Participants to join at the highest level of Series Package possible.

24. The coded bonus was a recruitment-based commission paid to a Participant for certain sales the Participant made or that were made by his or her assigned "downline" recruits

(those investors the Participant recruited who then became Participants themselves). Whether a Participant received the coded bonus for such a sale versus "passing it up" to a higher Participant depended on an alternating pattern depicted in the Compensation Plan as follows:



25. Like the coded bonus, the coded match also was recruitment-based. Indeed, it paid a 100% match to a Participant on any coded bonus received by that Participant's direct recruits (represented by the line of figures in the left-hand diagram, above). Being "matches," these payments were for identical amounts as the coded bonuses, but to receive them for sales of a given level of a Series Package, a Participant had to have first sold two packages at that level or higher.

26. A Participant stood to earn significantly more in coded bonuses and coded matches from sales made by his or her assigned downline recruits – versus his or her own sales – if those downlines were successful in recruiting others. In that regard, the potential earning power of the "upline" Participant was based on the efforts of his or her downline recruits.

27. The third and final type of commissions were those paid from eight profit sharing pools, into which Defendants placed 20% of the proceeds of all sales of Series Packages. Each Participant in a pool received a fractional *pro rata* share of those proceeds, with the share being diluted as additional Participants were recruited to Mindset 24 and joined in the pool (with the exception of the Founders Pool, described below). Thus, the more sales of Series Packages overall, the more each Participant stood to earn.

28. The Compensation Plan advertised the pools as "the most exciting part of the compensation plan, and the easiest way to earn," stating that the pools "allow[] everyone, even passive, or part-time sales agents, the ability to . . . earn commission[s]" and are the "EASIEST WAY EVER TO MAKE MONEY! The average person can join and start earning off the ENTIRE COMPANY." Thus, a Participant could earn compensation from the pools simply by purchasing a Series Package – no additional sales of the package by the Participant were necessary.

29. Qualifying for the lowest four pools (named "1 Star" to "4 Star") required buying or selling a Series Package with a number corresponding to, or higher than, the number of the pool. Placement into the next three pools (named "5 Star," "7 Star," and "Superstar") required increasingly high levels of sales made by a Participant. And lastly, the Founders Pool was only for those Participants who purchased the Series 4 Package early in September 2017, although the cutoff date to qualify was subsequently extended for promotional purposes. Defendants were to distribute 20% of the total sales proceeds across the pools in varying percentages, depicted in the Compensation Plan as follows:



**C. Defendants Receive a Legal Opinion Warning Them that Mindset 24 Risked Operating as a Pyramid Scheme**

30. In July 2017, shortly after they had prepared the final version of the Compensation Plan (which omitted the retail sales incentives they had included in the initial draft), Defendants sought advice on the legality of the plan from a well-known MLM attorney who provided them a

written legal opinion dated July 21, 2017. Both Defendants received and reviewed the legal opinion at the time it was provided.

31. Among other things, the legal opinion advised Defendants to make certain modifications to Mindset 24 in order to operate as a legitimate MLM company and not as an illegal pyramid scheme. Namely, the legal opinion strongly advocated for the Compensation Plan to include a retail sales requirement, emphasizing that legitimate MLMs rely primarily on substantial retail sales for compensation purposes, whereas pyramid schemes rely on recruiting and selling to other participants. Indeed, the opinion highlighted areas where Mindset 24 risked operating as a pyramid scheme, pointing to the Compensation Plan as incentivizing "buy to qualify" behavior and aggressive recruitment of participants rather than retail customers. And, the opinion warned of the unsustainability of pyramid schemes.

32. Despite having originally included retail sales incentives in the initial draft of the Compensation Plan, and despite having been made aware of the attorney's concerns in the legal opinion, Defendants did not add a retail sales requirement to the final Compensation Plan, nor did they modify any aspect of the plan identified as likely to encourage pyramid sales, instead proceeding forward with the plan they had prepared and making it available to Participants.

**D.     Promotion of the Mindset 24 Scheme**

33. Beginning on or about July 24, 2017 and continuing through at least May 10, 2018, Defendants offered the Series Packages and actively promoted Mindset 24 as a legitimate MLM online to the general public. This occurred predominantly via its website (www.mindset24global.com), where prospective Participants completed online registrations. They then were able to purchase Series Packages through the website mainly using bitcoin.

34. The website touted the Compensation Plan and made it available for all Participants to download. Defendants also displayed promotional videos about the company and emphasized the Compensation Plan. One such video advertised the potential of earning income "by simply exposing people to this . . . information" and stated that "if you can hand out a business card, or share a link on social media . . . our cutting edge system does the rest."

35. Defendants also aggressively promoted the company on social media, YouTube, and emails sent to those who had registered online. For example, in early September 2017, the company's public corporate Facebook page promoted the Founders Pool as a "prelaunch exclusive" for which individuals could qualify simply by buying a Series 4 package without making sales to others.

36. As another example, in a September 2017 YouTube interview with over five thousand views, McLane pitched the profit sharing pools and likened the Founders Pool to early-stage equity investing, stating:

> Imagine McDonalds, Coca-Cola, Microsoft, Apple. If they would have taken a sliver of a percent of the gross profit, and put it into a pool, for the first people that bought their product in the early days, how much money would they be sharing in on a daily basis today? And that's what we wanted to do. For the people that truly believe . . . we want them to be rewarded. And by them making a commitment . . . once we launch . . . no one else is able to get in that pool. So it's just a numbers game . . . . We believe that internationally, based on the growth we are seeing right now, we're going to have millions and millions of customers around the world. Well, you can do the math.

37. During the relevant time period, Defendants controlled the content of Mindset 24's website and its marketing materials. Participants did not play any role in the preparation or creation of the content, nor were Participants involved in managing the operation. Instead, a Participant merely had to refer a recruit to the website – once there, Defendants' systems and materials did the rest. Thus, the success of the recruitment (and corresponding level of compensation for the Participant) was substantially dependent on Defendants themselves.

### E. Mindset 24 Operated as a Pyramid and Ponzi Scheme and, Like Most Such Schemes, Eventually Collapsed

38. Sales of Series Packages to Participants began in early September 2017 and continued until at least April 2018. During that time, Defendants raised at least $1,028,620, mostly in bitcoin, from Participants.

39. Although the Compensation Plan gave Participants the option to qualify for commissions by selling Series Packages to others, rather than purchasing packages for themselves, 92% of Participants bought Series Packages to qualify. As described above, under the Compensation Plan, the coded bonus and coded match would kick in once the Participant's recruits purchased the packages for themselves. Those recruits then became Participants, and recruited additional investors downline to become Participants, with benefits of the recruiting inuring upline.

40. To bring on a new recruit, a Participant merely had to share a digital link to Mindset 24's website associated with the Participant's username and through which the recruit could then register, access the company's "back office" system, and set up a bitcoin wallet for purchasing a Series Package and receiving commissions. Defendants managed and controlled this recruitment infrastructure.

41. None of the sales of Series Packages were bona fide retail sales; all purchasers became Participants placed into the Compensation Plan and received payouts under one or more parts of the plan. At least 216 Participants received the coded bonus or the coded match, while at least 790 Participants were placed into and received distributions from the profit sharing pools – even if those Participants did not recruit any other Participants or make any sales of the Series Packages. The 216 Participants recruited the remaining Participants, which meant all of the funds in the profit sharing pools ultimately were related to, or the result of, recruiting. In addition, at least 82% of all Participants paid some or all of the monthly and annual Participant fees. And of

the Participants who did not receive a coded bonus or match but who were still placed into the profit sharing pools and received payouts, at least 80% of them paid some or all of the monthly and annual Participant fees.

42. Because the proceeds raised through sales of Series Packages derived from Participants who recruited additional Participants, the payouts under the Compensation Plan were made based solely on investments from the later Participants. In using the later investments to pay earlier Participants, Defendants knew, or were reckless in not knowing, that they were operating a classic Ponzi scheme.

43. Defendants also knew, or were reckless in not knowing, that Mindset 24 was not a legitimate MLM, but rather an illegal pyramid scheme. Both McLane and Nash had created and operated MLMs before Mindset 24. They had included retail sales incentives in the initial draft of the Compensation Plan, but ultimately omitted these incentives from the proposed final version. To avoid any potential confusion, when they submitted the proposed final version for review by a MLM attorney, the attorney told them that a retail sales requirement, and the existence of substantial retail sales, were the critical points of distinction between a legitimate MLM and an illegal pyramid scheme, and further advised them specifically to include a retail sales requirement in the Compensation Plan.

44. Furthermore, as the Mindset 24 operation was underway, Defendants knew, or were reckless in not knowing, that no bona fide retail sales were taking place; that almost all Participants were placed into the profit sharing pools; that the Compensation Plan specified that to take part in the plan, a Participant could either sell or purchase a Series Package, and the Compensation Plan allowed even passive Participants to benefit from the pools; and that all proceeds in the pools were related to, or the result of, recruiting. Defendants also knew, or were reckless in not knowing, that

they were actively receiving some or all of the monthly and annual Participant fees from at least 80% of those Participants who did not earn a coded bonus or match but who still were placed into the pools and received payouts. Accordingly, as Mindset 24 rewarded Participants with compensation based on recruitment rather than sales of the Series Packages to bona fide retail customers, the operation was an illegal pyramid scheme.

45. Because Defendants operated Mindset 24 as an illegal pyramid and Ponzi scheme, both knew, or were reckless in not knowing, the company was dependent on the continued recruitment of additional Participants rather than bona fide retail customers. Defendants were experienced in the industry, and thus knew, or were reckless in not knowing, that Mindset 24's model was not sustainable. And because the MLM attorney warned Defendants of what ultimately befalls a pyramid scheme, Defendants knew, or were reckless in not knowing, Mindset 24 was destined to collapse. And yet, Defendants failed to disclose any of these details to Participants.

46. Indeed, the vast majority of the proceeds came in the first three months of Mindset 24's sales activity, after which sales fell off precipitously to virtually nothing, as the company progressed toward inevitable collapse, as indicated in the following chart:

| Month | Proceeds | % of Total Proceeds |
|---|---|---|
| September | $680,249 | 66.1% |
| October | $156,162 | 15.2% |
| November | $144,228 | 14.0% |
| December | $24,672 | 2.4% |
| January (2018) | $21,559 | 2.1% |
| February | $270 | < 0.1% |
| March | $1,390 | 0.1% |
| April | $90 | < 0.1% |
| Total | $1,028,620 | 100% |

47. By April 2018, Defendants were not realizing any new sales of Series Packages, although they continued to accept free web registrations from new potential Participants until at least May 2018.

48. The vast majority of Participants lost money. Of the at least 735 Participants who paid for a Series Package, 92% suffered losses, with an average loss of $1,168.

### F. Defendants Misappropriated and Misallocated Commissions

49. Defendants paid Participants $694,983 in commissions in roughly the percentages the Compensation Plan advertised, but Defendants placed themselves at the top of the compensation structure, so as to receive approximately $51,587 of those commissions – an amount representing over 5% of the total proceeds from the sale of Series Packages. Defendants elected to treat this $51,587 as company revenue, on top of the monthly and annual Participant fees and the 30% of sales proceeds that Defendants had already retained.

50. In the MLM industry, commissions which could be paid to participants but which are retained by the company are referred to as "breakage." Defendants knew, or were reckless in not knowing, what breakage was, but never disclosed to Participants that Defendants were actively engaged in breakage. In fact, the Compensation Plan that Defendants created specifically represented that Mindset 24 had "absolutely no breakage."

51. In addition, with respect to distributing proceeds to Participants in the profit sharing pools, Nash implemented a system that syphoned 0.5% of commissionable dollars from each of the four lowest pools (into which Participants were placed simply by purchasing Series Packages) and instead allocated those proceeds to the higher pools that were more difficult to qualify for. This was inconsistent with the pool allocations advertised in the Compensation Plan, and resulted in $19,344 being misappropriated from the pools containing the vast majority of passive

Participants and placed into pools containing far fewer and more active Participants, as indicated in the following chart:

| Pool Name | Amount Allocated to Pool | Advertised % of Commissionable $ | Actual % of Commissionable $ |
|---|---|---|---|
| Star 1 Pool | $15,132.11 | 2% | 1.5% |
| Star 2 Pool | $14,489.16 | 2% | 1.5% |
| Star 3 Pool | $14,349.87 | 2% | 1.5% |
| Star 4 Pool | $24,573.33 | 3% | 2.5% |
| Star 5 Pool | $34,661.96 | 3% | 3.5% |
| Star 7 Pool | $43,136.09 | 4% | 4.4% |
| Super Star Pool | $22,530.20 | 2% | 2.3% |
| Founders Pool | $22,237.19 | 2% | 2.3% |

## COUNT I

**Unregistered Offers and Sales of Securities in Violation of
Sections 5(a) and 5(c) of the Securities Act**

**(Against Both Defendants)**

52.     The Commission repeats and realleges Paragraphs 1 through 51 of its Complaint.

53.     The offer and sale of interests in the Compensation Plan was an offer and sale of securities. Participants' interests in the Compensation Plan were investment contracts. Participants made an investment of money – here bitcoin – in a common enterprise about which they were led to expect profits solely from the efforts of Defendants or third parties.

54.     Defendants directly or indirectly offered and sold interests in the Compensation Plan and/or were necessary participants or substantial factors in the offer and sale of interests in the Compensation Plan because Defendants conceived of and planned the scheme through which the unregistered securities were offered and sold.

55.     No registration statement was filed or in effect with the Commission pursuant to the Securities Act with respect to the securities and transactions described in this Complaint and no exemption from registration exists with respect to these securities and transactions.

56. Defendants directly or indirectly (a) made use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell securities through the use or medium of a prospectus or otherwise; (b) carried or caused to be carried securities through the mails or in interstate commerce, by any means or instruments of transportation, for the purpose of sale or delivery after sale; and (c) made use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise, any securities, without a registration statement having been filed or being in effect with the Commission as to such securities.

57. By reason of the foregoing, Defendants violated, and, unless enjoined, are reasonably likely to continue to violate, Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c).

## COUNT II

### Fraud in Violation of Section 17(a)(1) of the Securities Act

**(Against Both Defendants)**

58. The Commission repeats and realleges Paragraphs 1 through 51 of its Complaint.

59. Defendants, in the offer or sale of any securities by the use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly knowingly or recklessly employed a device, scheme or artifice to defraud.

60. By reason of the foregoing, Defendants violated, and, unless enjoined, are reasonably likely to continue to violate, Section 17(a)(1) of the Securities Act, 15 U.S.C. § 77q(a)(1).

## COUNT III

### Fraud in Violation of Section 17(a)(3) of the Securities Act

### (Against Both Defendants)

61. The Commission repeats and realleges Paragraphs 1 through 51 of its Complaint.

62. Defendants, in the offer or sale of securities by the use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly knowingly, recklessly or negligently engaged in a transaction, practice or course of business which operated or would operate as a fraud or deceit upon the purchaser of such securities.

63. By reason of the foregoing, Defendants violated, and, unless enjoined, are reasonably likely to continue to violate, Section 17(a)(3) of the Securities Act, 15 U.S.C. § 77q(a)(3).

## COUNT IV

### Fraud in Violation of Section 10(b) and Rule 10b-5(a) of the Exchange Act

### (Against Both Defendants)

64. The Commission repeats and realleges Paragraphs 1 through 51 of its Complaint.

65. Defendants directly or indirectly, by the use of the means or instrumentalities of interstate commerce, or of the mails, knowingly or recklessly employed a device, scheme or artifice to defraud, in connection with the purchase or sale of securities.

66. By reason of the foregoing, Defendants violated, and, unless enjoined, are reasonably likely to continue to violate, Section 10(b) and Rule 10b-5(a) of the Exchange Act, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(a).

## COUNT V

### Fraud in Violation of Section 10(b) and Rule 10b-5(c) of the Exchange Act

**(Against Both Defendants)**

67. The Commission repeats and realleges Paragraphs 1 through 51 of its Complaint.

68. Defendants directly or indirectly, by the use of the means or instrumentalities of interstate commerce, or of the mails, knowingly or recklessly engaged in an act, practice or course of business which operated or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of securities.

69. By reason of the foregoing, Defendants violated, and, unless enjoined, are reasonably likely to continue to violate, Section 10(b) and Rule 10b-5(c) of the Exchange Act, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(c).

### RELIEF REQUESTED

**WHEREFORE**, the Commission respectfully requests the Court find that Defendants committed the violations charged and that, as a result of these violations, Defendants received ill-gotten gains; and enter Judgments:

### I.

### Permanent Injunctions

Permanently restraining and enjoining Defendants, their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, and each of them, from directly or indirectly violating the federal securities laws alleged in this Complaint; and further permanently restraining and enjoining Defendants, their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, and each of

them, from directly or indirectly offering, operating, or participating in any marketing or sales program in which a participant is compensated or promised compensation solely or primarily for inducing another person to become a participant in the program, or if such induced person induces another to become a participant in the program.

## II.

### Disgorgement

Ordering Defendants to disgorge, with prejudgment interest, the net profits they received from their ill-gotten gains as a result of the acts or courses of conduct alleged in this Complaint, pursuant to Section 21(d)(5) of the Exchange Act, 15 U.S.C. § 78u(d)(5).

## III.

### Penalties

Ordering Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d); and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3).

## IV.

### Further Relief

Granting such other and further relief as the Court determines to be necessary and appropriate.

## V.

### Retention of Jurisdiction

Further, the Commission respectfully requests the Court retain jurisdiction over this action and over Defendants in order to implement and carry out the terms of all orders and decrees that

may hereby be entered, or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

## JURY DEMAND

The Commission demands a trial by jury as to all claims so triable.

DATED: August 31, 2020

Respectfully submitted,

SECURITIES AND EXCHANGE COMMISSION

By:  /s/ Patrick R. Costello

Patrick R. Costello (Florida Bar No. 75034)
Attorney for Plaintiff
Securities and Exchange Commission
100 F Street NE
Washington, DC 20549-5949
Telephone: (202) 551-3982
Fax: (202) 772-9282
Email: costellop@sec.gov
*Appearing pursuant to LR 83.2(b)*

OF COUNSEL:

Benjamin Perlman
Nina B. Finston
Securities and Exchange Commission
100 F Street NE
Washington, DC 20549-5949